# United States Court of Appeals
## For the First Circuit

---

No. 12-1867

UNITED STATES OF AMERICA,
ex rel. HEIDI HEINEMAN-GUTA, Relator,

Plaintiff, Appellant,

v.

GUIDANT CORPORATION; BOSTON SCIENTIFIC CORPORATION,
individually and as Successor-in-Interest to Guidant Corporation,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Torruella, Stahl, and Thompson,
Circuit Judges.

---

Loren Jacobson, with whom Charles S. Siegel and Waters &
Kraus, LLP, were on brief for appellant.
Jonathan S. Franklin, with whom Frederick Robinson, Mark
Emery, and Fulbright & Jaworski LLP, were on brief for appellees.

---

May 31, 2013

---

THOMPSON, **Circuit Judge.** Appellant Heidi Heineman-Guta ("Heineman-Guta"), on behalf of the United States, brought a qui tam action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., against Guidant Corporation ("Guidant") and Boston Scientific Corporation ("BSC") alleging they engaged in a kickback scheme to promote the sale and use of their cardiac rhythm management devices. The district court dismissed Heineman-Guta's complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on the basis that an earlier-filed complaint barred consideration of Heineman-Guta's complaint under the first-to-file rule of the FCA, id. § 3730(b)(5). Heineman-Guta challenges the dismissal, arguing on appeal, as she did below, that the earlier-filed complaint cannot adequately serve as a preclusive first-filed complaint to trigger the first-to-file bar because it does not meet the heightened pleading standard under Rule 9(b).[1]

Heineman-Guta raises an issue of first impression in this circuit; that is, whether § 3730(b)(5) requires the first-filed complaint to meet the heightened pleading standards of Rule 9(b) to bar a later-filed complaint. We hold it does not and affirm the district court.

---

[1]Rule 9(b) provides in relevant part that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

## BACKGROUND

### A.   The FCA

          To set the stage, we start with a brief overview of the
FCA and the provisions that are relevant to this case.   The FCA
prohibits the knowing submission of false or fraudulent claims for
payment, or causing the submission of such claims, to the federal
government and prescribes fines and treble damages to penalize
offenders. 31 U.S.C. § 3729(a).[2]   The FCA's qui tam provisions
"supplement federal law enforcement resources by encouraging
private citizens to uncover fraud on the government."   United
States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 727 (1st Cir.
2007).   Such provisions permit private persons (known as relators)
to bring certain fraud claims on behalf of the United States
Government.   31 U.S.C. § 3730(b).[3]   Qui tam actions are filed under

---

          [2]The FCA provides, in pertinent part:

          "[A]ny person who--(A) knowingly presents, or causes to
          be presented [to an officer or employee of the United
          States Government] a false or fraudulent claim for
          payment or approval; . . . [or] (G) knowingly makes,
          uses, or causes to be made or used, a false record or
          statement material to an obligation to pay or transmit
          money or property to the Government; . . . is liable to
          the United States Government for a civil penalty of not
          less than $5,000 and not more than $10,000, as adjusted
          . . . plus 3 times the amount of damages which the
          Government sustains because of the act of that person."

          31 U.S.C. § 3729.

          [3]"'Qui tam' comes from the phrase 'qui tam pro domino rege
          quam pro se ipso in hac parte sequitur,' which translates as 'who
          pursues this action on our Lord the King's behalf as well as his

-3-

seal and remain that way for at least 60 days.  Id. § 3730(b)(2).
This procedure gives the government an opportunity to assess the
relator's complaint and decide whether to intervene and assume
primary responsibility for prosecuting the case.  Id. § 3730(b)(2),
(b)(4), (c)(1).  A relator is entitled to recover a share of the
proceeds from the action, subject to the requirements of the
statute, regardless of whether the government decides to intervene.
Id. § 3730(d).

   The FCA also, however, includes certain jurisdictional
bars, limiting a district court's subject matter jurisdiction over
qui tam actions.  United States ex rel. Duxbury v. Ortho Biotech
Prods., 579 F.3d 13, 16 (1st Cir. 2009).  As relevant to this case,
the "first-to-file" rule bars a "person other than the Government"
from "bring[ing] a related action based on the facts underlying the
pending action."  31 U.S.C. § 3730(b)(5).  With this statutory
scheme in mind, we turn to the two complaints against Guidant and
BSC and detail the allegations made in each below.[4]

### B.  The FCA Allegations Against BSC

#### 1.  The Bennett Complaint

   On October 16, 2008, Elaine Bennett filed a qui tam
action against BSC in the United States District Court for the

---

own.'"  Rost, 507 F.3d at 727 n.4 (quoting Rockwell Int'l Corp. v.
United States, 549 U.S. 457, 463 n.2 (2007)).

   [4]BSC acquired Guidant in 2006.  For simplicity, we refer to
Guidant and BSC as "BSC" throughout this opinion.

District of Maryland.[5]  In that action, Bennett, a former employee of BSC, claimed that between 2003 and early October 2008, BSC engaged in an unlawful kickback scheme within its Cardiac Rhythm Management ("CRM") division to induce physicians and hospitals to use BSC's pacemakers, internal cardiac defibrillators, and cardiac resynchronization therapy ("CRT"), thereby increasing the company's market share of these devices.  BSC has allegedly offered various types of renumeration to hospitals and physicians in exchange for their use of BSC's devices in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and has caused physicians who received kickbacks to make false claims for reimbursement under Medicare in violation of the FCA.

BSC furthers its alleged kickback scheme in a number of ways:  first, by "provid[ing] doctors and hospitals with kickbacks in the form of follow-up medical services in exchange for the providers' use of BSC's cardiac rhythm devices"; second, by "induc[ing] doctors and hospitals to bill for medical services and procedures they d[id] not perform"; third, by "requir[ing] BSC sales personnel to provide medical care in the absence of a licensed physician or staff member"; fourth, by "improperly conduct[ing] Medicare billing for physicians and hospitals through non-licensed, non-medical staff"; fifth, by "provid[ing] monetary

---

[5]Donald Boone, a Virginia resident and Guidant employee from 1986 to 1996, joined the Bennett Complaint as a relator.

'grants' to foundations set up by physicians and physician groups in return for favored status by such physicians," and; sixth, by "sponsor[ing] dinner meetings for implanting physicians to invite potential 'referring physicians' to, in order for the implanting physician to increase the number of patients he receives for implants from those referring physicians." In most instances, "the benefitting implanting physician also receives an 'honorarium' for speaking about his or her expertise at the program."

BSC provides physicians access to an internet-based monitoring system called "The Latitude Patient Management System" ("Latitude"), which allows patients to receive post-implant care from their residences without having to meet with a physician in-person. Latitude transmits information obtained from the implanted device through the internet to the physician's office. The physician can then use the information to determine whether the device is working properly, and whether any adjustments are necessary. Part of BSC's representatives' follow-up care for a patient's device includes office visits, "phone checks," and driving to rural areas to conduct follow-up site visits. Because phone checks cost less than office visits, BSC representatives often conduct more phone consultations so that physicians can increase their billing to Medicare. BSC representatives advise physicians' offices on how to bill Medicare for the maximum reimbursement for Latitude services.

-6-

In addition, BSC organizes networking events where surgeons can meet physicians who might provide referrals. The "host" surgeon is allegedly paid "as if the event were a speaking engagement when in fact it is simply a marketing ploy to increase the surgeon's" and BSC's business. BSC "incentivizes the use of [its] devices by planning and funding dinner programs held by implanting physicians." BSC identifies implanting physicians and "organizes and pays for lavish dinner programs so that the physician in question can network with potential referring physicians." In many instances, BSC "improperly pays the benefitting physician 'honoraria' for 'speaking' at these dinner programs."

On September 28, 2011, the United States declined to intervene in Bennett's case. One month later, the government and Bennett agreed to voluntarily dismiss the matter. The district court dismissed the case and the seal was lifted.[6]

---

[6]Before Bennett filed her October 16, 2008 complaint, she filed a complaint (under her previous name, Elaine George) against BSC in November 2006. United States ex rel. Bennett v. Bos. Scientific Corp., No. 07-2467, 2011 WL 1231577, at *1 (S.D. Tex. Mar. 31, 2011). The complaint, originally filed in the United States District Court for the Northern District of Illinois, was transferred to the United States District Court for the Southern District of Texas in July 2007. On July 10, 2009, Bennett filed an amended complaint ("the George Complaint"). The George Complaint alleged inter alia that BSC and Guidant violated the FCA through an "off-label marketing campaign and the use of illegal kickbacks" that caused physicians to perform an increased number of inpatient surgical ablation procedures when less invasive and less expensive procedures could have been performed. The George Complaint was dismissed without prejudice for failure to satisfy Rule 9(b). Id.

## 2. The Heineman-Guta Complaint

On November 10, 2009, while the Bennett complaint was still pending and under seal, Heineman-Guta filed a qui tam complaint under seal alleging BSC violated the FCA. Heineman-Guta amended her complaint on January 30, 2012.

Like Bennett, Heineman-Guta made numerous allegations concerning BSC's kickback scheme. Heineman-Guta, a former account manager in BSC's heart failure management group from April 2003 until November 2007, claimed that over her four-year employment with BSC, it defrauded the Government by engaging in a scheme to provide kickbacks in various forms to physicians to encourage them to both implant its cardiac rhythm management devices and refer patients that would be implanted with such devices.

Specifically, Heineman-Guta says that BSC instructed her to provide "lavish trips and entertainment to physicians in order to encourage them to refer patients for implantation of Guidant cardiac rhythm management devices." BSC offered physicians all-expense paid trips and used expensive meals to induce them to

---

at *28, *35. In the present case, BSC argued in its motion to dismiss that the previously dismissed George Complaint, in addition to the Bennett Complaint, served as a preclusive first-filed complaint. Agreeing with Heineman-Guta, the district court rejected the notion that the George Complaint could serve as a preclusive first-filed complaint because it did not allege a kickback scheme to promote the sale of cardiac rhythm management devices. United States ex rel. Heineman-Guta v. Guidant Corp. et al., 874 F. Supp. 2d 35, 38 (D. Mass. 2012). Since BSC does not challenge that conclusion, the George Complaint is not at issue in this appeal.

-8-

insist on the implantation of BSC devices or refer patients for implantation. BSC required sales representatives to prepare customer management plans on how to retain customers, grow their business or win back their support and gain market share from them.

BSC paid physicians as speakers to gain their loyalty, repeatedly paying one high-volume implanting physician between $1200 and $2500 per engagement over the course of two years. A July 2005 company power point presentation on sales-representative training allegedly instructed that "best practices" at the company included compensating physicians by providing them with speaking opportunities.

BSC used "case reviews" to funnel money to referring physicians and to provide a steady stream of patient referrals for implanting physicians who were loyal to BSC. Under the "case review" program, BSC invited an implanting physician along with several referring physicians to an expensive dinner. At the dinner, the implanting physician "reviewed" cases for possible referral. In addition to paying for the dinner, BSC allegedly paid each referring physician a $250 fee for each patient chart they brought to the dinner. BSC used the case review program as a means to not only funnel money to referring physicians, but also to ensure the commitment of participating implanting physicians to implant BSC cardiac rhythm management devices.

-9-

In addition, BSC conducted "sham clinical trial" programs. Heineman-Guta pointed to one specific "sham program" called ADVANCENT, which was an "observational registry" of patients with certain symptoms of cardiac failure. Through this program, BSC allegedly targeted physicians who were loyal to BSC and paid them for each patient they entered into the database who had those symptoms.

BSC also assisted fellows in finding employment in practices that primarily implanted BSC devices. BSC helped place fellows in certain practices and hospitals in exchange for promises from those practices and hospitals that they would mainly use BSC devices.

According to the amended complaint, these kickbacks caused certain physicians to implant or recommend the use of BSC devices. In addition to providing the initials of the specific referring and implanting physicians, the initials of the patients who received implantations due to the purported scheme and the dates and places of implantation, the amended complaint detailed the trips, meals and hotel reimbursements for physicians who implanted BSC devices. BSC, knowing that Medicare would pay for the vast majority of these implants, allegedly promoted the highly lucrative nature of implanting its devices by pointing out to implanting physicians the extent to which Medicare would provide reimbursement for implantations and the profit margins physicians

-10-

could make from such reimbursement. Lastly, Heineman-Guta claimed that BSC caused physicians and hospitals, who must certify compliance with the federal Anti-Kickback Statute, to make false certifications that were material to the government's decision to pay for the implantation of the companies' cardiac devices.

### 3. The Dismissal of the Amended Complaint

On July 5, 2012, about nine months after the government and Bennett voluntarily dismissed the Bennett Complaint, the district court in this case granted BSC's motion to dismiss Heineman-Guta's amended complaint for lack of subject matter jurisdiction under Rule 12(b)(1). Guidant Corp., 874 F. Supp. 2d at 41. The court held that the first-to-file rule under 31 U.S.C. § 3730(b)(5) barred consideration of the amended complaint because it alleged the same "essential facts" of the kickback scheme as the Bennett Complaint. Id. at 38-39, 41. The court found that the essential facts contained in the Bennett Complaint provided the government sufficient notice that it was the potential victim of fraud worthy of investigation and, that as a result, it served as the preclusive first-filed complaint for the purposes of § 3730(b)(5). Id. at 40-41.

Despite the fact that the Bennett Complaint had been voluntarily dismissed in another court which had not been called upon to examine its Rule 9(b) sufficiency, Heineman-Guta's main argument below was that the Bennett Complaint did not satisfy that

-11-

rule's particularity requirements.  She contended that the Bennett Complaint lacked specific details about the alleged kickback scheme such as dates, places and names of physicians involved.  According to Heineman-Guta, the Bennett Complaint's failure to satisfy Rule 9(b) pleading requirements meant it could not serve as a preclusive first-filed complaint under § 3730(b)(5) to bar her qui tam action.  The district court, recognizing we had yet to rule on whether preclusive first-filed complaints must comply with Rule 9(b), rejected her argument.  Id. at 40 n.10.  In doing so, it adopted the reasoning of the D.C. Circuit in United States ex rel. Batiste v. SLM Corp., 659 F.3d 1204, 1210 (D.C. Cir. 2011), which held that a complaint need not satisfy Rule 9(b) requirements to serve as a preclusive first-filed complaint under § 3730(b)(5).  Id. at 40.  Heineman-Guta timely appealed.

## DISCUSSION

Heineman-Guta argues that the district court erred in dismissing her amended complaint based on its conclusion that the FCA's first-to-file rule does not require the first-filed complaint to meet the particularity requirements for pleading fraud under Rule 9(b).  We review de novo the dismissal of an action under the FCA for lack of subject matter jurisdiction.  United States ex. rel. Estate of Cunningham v. Millennium Labs. of Cal., Inc., No. 12-1258, 2013 WL 1490435, at *6 (1st Cir. Apr. 12, 2013).

-12-

The question in this case is narrow. It is whether a first-filed complaint under the FCA's first-to-file rule, § 3730(b)(5), must comply with Rule 9(b) particularity requirements in order to give sufficient notice to the government of an alleged fraudulent scheme. To that narrow question, for reasons explained below, we hold it does not.

The first-to-file rule bars a plaintiff from bringing "a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).[7] The rule is intended to "provide incentives to relators to 'promptly alert[ ] the government to the essential facts of a fraudulent scheme.'" Duxbury, 579 F.3d at 32 (alteration in original) (quoting United States ex rel. Lujan v. Hughes Aircraft Co., 243 F.3d 1181, 1188 (9th Cir. 2009)). To further that purpose, we have said that the first-to-file rule bars a later-filed complaint if it "'states all the essential facts of a previously-filed [complaint]' or 'the same elements of a fraud described in an earlier suit.'" Duxbury, 579 F.3d at 32 (emphasis omitted) (quoting United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 149 F.3d 227, 232-33 (3d Cir. 1998)).[8] Under this essential facts test, the first-to-file rule

---

[7]It is undisputed that the Bennett Complaint was pending when Heineman-Guta filed her complaint.

[8]The district court noted that Heineman-Guta did not deny the Bennett Complaint disclosed a fraudulent scheme nearly identical to the one alleged in the amended complaint. Guidant Corp., 874 F. Supp. 2d at 39. Heineman-Guta does not expressly challenge that

-13-

bars a later complaint even if that complaint "incorporates somewhat different details." Duxbury, 579 F.3d at 32 (quoting LaCorte, 149 F.3d at 232-33) (internal quotation mark omitted). Heineman-Guta says the appropriate standard under which first-filed complaints should be assessed is not an essential facts standard, but rather the pleading standard set forth in Rule 9(b).

    Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b) pleading requirements, the "complaint must specify 'the time, place, and content of an alleged false representation.'" Rost, 507 F.3d at 731 (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996)). To discern whether § 3730(b)(5) imposes Rule 9(b)'s pleading standard on earlier-filed complaints alleging FCA violations, we start, as we must, with the language of the statutory provision. United States v. Armstrong, 706 F.3d 1, 5 (1st Cir. 2013). "Where the language of the statute is plain and the meaning unambiguous, we will do no more than enforce the statute in accordance with those plain terms." United States v. Booker, 644 F.3d 12, 17 (1st Cir. 2011). Section 3730(b)(5) says "no person other than the Government" can "bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). Nothing in the language of § 3730(b)(5) references

---

finding on appeal.

-14-

Rule 9(b)'s particularity requirements. We will not ordinarily read requirements into a statute that "do not appear on its face." See Dean v. United States, 556 U.S. 568, 572 (2009) (quoting Bates v. United States, 522 U.S. 23, 29 (1997)) (internal quotation mark omitted). The language is plain and simple: an action is barred if it is a "related action" that is "based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5) (emphasis added). Section 3730(b)(5) contains no exceptions, and certainly not one requiring that the "pending" earlier-filed action comply with Rule 9(b)'s heightened pleading standard. Duxbury, 579 F.3d at 33 (noting § 3730(b)(5) is "'exception-free'" (quoting Lujan, 243 F.3d at 1187)).

Had Congress wanted to incorporate Rule 9(b) particularity requirements into § 3730(b)(5), it could have done so. Congress referenced the Federal Rules of Civil Procedure in various FCA provisions. See, e.g., 31 U.S.C. §§ 3732(a), 3733(b)(1)(B), 3733(c)(2), 3733(h)(1), 3733(j)(6). Indeed, § 3730(b) twice refers to the Federal Rules of Civil Procedure. See id. §§ 3730(b)(2), 3730(b)(3) (referring to Rule 4's service requirements). As is the case here, when Congress includes language in one section of a statute but omits it in another, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Keene Corp. v. United States, 508 U.S. 200, 208 (1993) (quoting Russello v. United

-15-

_States_, 464 U.S. 16, 23 (1983)) (internal quotation mark omitted). Congress's reference to the Federal Rules of Civil Procedure in some of the FCA's provisions, particularly the subsections under § 3730(b), and the omission of any Rule 9(b) requirement from § 3730(b)(5), tells us that Congress did not intend the first-to-file rule to incorporate Rule 9(b)'s heightened pleading standard.

Contrary to Heineman-Guta's contention otherwise, the allegations of a preclusive first-filed complaint under § 3730(b)(5) need not comport with Rule 9(b)'s pleading requirements to provide the government with sufficient notice of potential fraud. In amending the FCA in 1986 to add § 3730(b)(5), Congress sought to strike the appropriate balance "between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." _LaCorte_, 149 F.3d at 234 (quoting _United States ex rel. Springfield Terminal Ry_ v. _Quinn_, 14 F.3d 645, 650 (D.C. Cir. 1994)) (internal quotation mark omitted); _see_ False Claims Amendments Act of 1986, Pub. L. No. 99-562, § 3, 100 Stat. 3153, 3154-55 (1986). To achieve that balance, § 3730(b)(5) "allow[s] recovery when a _qui tam_ relator puts the government on notice of potential fraud," and "bar[s] copycat actions that provide no additional material information" about the fraud. _Batiste_, 659 F.3d at 1210 (underline omitted); _see also_ _LaCorte_, 149 F.3d at 233-34 (Section 3730(b)(5) is

-16-

intended to prevent parasitic suits and duplicative awards covering the same behavior).  This means that if the first-filed complaint contains enough material information (the essential facts) about the potential fraud, the government has sufficient notice to launch its investigation.  At that point, the purpose of the qui tam action under § 3730(b) is satisfied.  If a later-filed action, filed while the first one is pending, offers merely additional facts and details about the same scheme, the later-filed action will be barred because it is duplicative of the first suit.  The reason for allowing private persons to bring qui tam actions is to reduce fraud against the government.  A later-filed complaint that mirrors the essential facts as the pending earlier-filed complaint does nothing to help reduce fraud of which the government is already aware.  <u>LaCorte</u>, 149 F.3d at 234.[9]

---

[9]In arguing that only the particularity required by Rule 9(b) suffices to provide the government with sufficient notice of alleged fraud, Heineman-Guta challenges the district court's use of the essential facts test in deciding whether the government had such notice.  At base, she argues that the essential facts test is not used to decide whether the first-filed complaint provides adequate notice to the government to justify barring subsequently filed complaints under the first-to-file rule.  Heineman-Guta's argument ignores this court's precedent.  As we noted in <u>Duxbury</u>, and reiterate here, the purpose of the first-to-file rule is to promptly notify the government about the essential facts of a fraudulent scheme.  <u>Duxbury</u>, 579 F.3d at 25, 32.  In <u>Duxbury</u>, this circuit adopted the essential facts standard and applied that standard in determining whether the later-filed complaint was barred under § 3730(b)(5).  <u>Id.</u> at 32-33.  The essential facts standard is therefore applied to determine whether the government has been adequately alerted of the essential facts of the fraudulent scheme in the first-filed complaint such that the later-filed complaint (filed while the first one is pending)

Unlike the purpose served by § 3730(b)(5), Rule 9(b) is not concerned with providing the government notice sufficient to enable it to launch an investigation into alleged fraudulent practices. Rule 9(b) is intended "to protect defendants in fraud cases from frivolous accusations and allow them to prepare an appropriate" defense. <u>Batiste</u>, 659 F.3d at 1210; <u>see also</u> <u>United States</u> v. <u>Williams Martin-Baker Aircraft Co.</u>, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (Rule 9(b)'s requirements "discourage the initiation of suits brought solely for their nuisance value, and safeguard potential defendants from frivolous accusations of moral turpitude" (citation and alteration omitted)); <u>Fidelity Nat'l Title Ins. Co. of N.Y.</u> v. <u>Intercounty Nat'l Title Ins. Co.</u>, 412 F.3d 745, 748 (7th Cir. 2005) (Rule 9(b)'s purpose is to "minimize the extortionate impact that a baseless claim of fraud can have on a firm or an individual"). Undoubtedly, as a general matter a complaint alleging a fraudulent scheme under the FCA must comply with Rule 9(b) pleading requirements or face dismissal. <u>Duxbury</u>, 579 F.3d at 29-30 (a relator must allege "the who, what, where, and when of the allegedly false or fraudulent representation" (internal quotation marks and citation omitted)); <u>see</u> <u>United States ex rel. Gagne</u> v. <u>City of Worcester</u>, 565 F.3d 40, 45 (1st Cir. 2009). But the question of whether allegations in a complaint have been plead with sufficient particularity under Rule 9(b) to withstand a

---

alleging the same essential facts is barred.

-18-

defendant's motion to dismiss is distinct from whether the allegations give the government adequate notice of potential fraud to begin an investigation under the first-to-file rule. A complaint that does not comply with Rule 9(b)'s particularity requirements to protect the defendant's interests may nonetheless provide the government sufficient notice to begin an investigation of an alleged fraudulent scheme. See Batiste, 659 F.3d at 1210.

We therefore hold that, for the purposes of the first-to-file rule, the earlier-filed complaint need not meet the heightened pleading standard of Rule 9(b) to provide sufficient notice to the government of the alleged fraud and bar a later-filed complaint under § 3730(b)(5); earlier-filed complaints must provide only the essential facts to give the government sufficient notice to initiate an investigation into allegedly fraudulent practices.[10]

---

[10]We thus reject Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005), which imposed Rule 9(b)'s heightened pleading standard on first-filed complaints under § 3730(b)(5). In grafting Rule 9(b) particularity requirements onto the first-to-file rule, the Sixth Circuit did not address in-depth the plain language of § 3730(b)(5), or the different purposes behind Rule 9(b) and § 3730(b)(5). See id. We, like the district court, agree instead with the D.C. Circuit's holding in Batiste, that first-filed complaints under § 3730(b)(5) need not satisfy Rule 9(b) particularity requirements. In holding that first-filed complaints need not meet Rule 9(b)'s standards under the first-to-file rule, the D.C. Circuit noted, as we do here, that nothing in the plain language of § 3730(b)(5) incorporates Rule 9(b) particularity requirements "which militates against reading such a requirement into the statute." Id. at 1210. The D.C. Circuit pointed out that the language of § 3730(b)(5) bars complaints related to earlier-filed "pending" actions which plainly means that "as long as a first-filed complaint remains pending, no related complaint may be filed." Id. The D.C. Circuit further

-19-

Applying that standard to this case, there is no question that the Bennett Complaint provided the essential facts of BSC's alleged fraud to give the government notice sufficient to initiate its investigation and consequently bar Heineman-Guta's amended complaint. We disagree with Heineman-Guta's characterization of the Bennett Complaint's allegations as "barebones," cursory and speculative. Like Heineman-Guta's amended complaint, the heart of the Bennett complaint is that BSC and Guidant used kick-backs to induce physicians and hospitals to submit false or fraudulent claims to the government, specifically Medicare, as part of BSC's scheme to induce implantation of BSC devices and thereby increase its own market share. The Bennett Complaint alleged that BSC used various forms of kickbacks to promote the same cardiac rhythm management devices such as pacemakers, defibrillators, among others, and encourage the use of the "Latitude" patient management system. The Bennett Complaint described the same types of kickbacks as disclosed in Heineman-Guta's amended complaint, such as payment of honoraria to physicians, lavish meals and dinner programs designed to generate referrals, payment of grants to educational foundations used as a guide to funnel money to physicians, and BSC's "coach[ing]" of physicians on the profits to be made by charging Medicare for care related to cardiac rhythm

---

observed the different goals served by Rule 9(b) and § 3730(b)(5), noting that Rule 9(b) is about deterrence, not preclusion. See id.

devices.[11]   The complaint further alleged, like Heineman-Guta's
amended complaint, that as a result of BSC's kickback scheme, BSC
caused physicians and hospitals to make and use false statements to
obtain reimbursement for health care services provided under
Medicare.

Heineman-Guta says the Bennett Complaint cannot be
preclusive because it fails to allege particular incidents, dates,
times or names of physicians as alleged in her amended complaint.
But the statute does not require the facts alleged in both
complaints be identical; they need only overlap in their material
facts.  See LaCorte, 149 F.3d at 233 ("[S]ection 3730(b)(5)'s plain
language is conclusive; the statute speaks of a 'related action,'
not an identical one.").  If the earlier-filed complaint contains
enough material facts to alert the government to potential fraud,
a later-filed complaint, like Heineman-Guta's, containing the same
essential facts but incorporating additional or "somewhat different
details," is nonetheless barred.  Duxbury, 579 F.3d at 32 (internal
quotation mark and citation omitted).  The fact that the Bennett
complaint does not allege, for example, where lavish dinner

---

[11]Although the Bennett Complaint, unlike Heineman-Guta's
amended complaint, does not explicitly mention the placement of
residents in practices in exchange for a commitment to use BSC
devices, this is an additional detail about the alleged fraudulent
scheme in inducing physicians and hospitals to implant BSC devices.
Because the Bennett Complaint's allegations provided the government
with notice sufficient to initiate its investigation, this
additional detail is one the government would have been able to
uncover in its investigation.

programs were held does not change the essential fact that BSC used gifts such as expensive meals as kickbacks to induce physicians to use its devices. And, the Bennett Complaint alleges the essential facts of BSC's fraudulent scheme: that it used various forms of kickbacks including lavish dinner programs, honoraria and grants, to induce physicians and hospitals to use its products and, in doing so, caused false claims to be submitted to obtain reimbursement from the government under Medicare.[12] Because Heineman-Guta's amended complaint alleges the same essential facts, it merely echos the alarm sounded by Bennett's complaint and is barred under § 3730(b)(5).

We further reject Heineman-Guta's argument, pulled from the Sixth's Circuit's reasoning in Walburn, that failing to impose Rule 9(b)'s particularity requirements on earlier-filed complaints under § 3730(b)(5) would encourage would-be qui tam relators to file overly broad, vague and speculative complaints simply to prevent other potential relators from filing more-detailed complaints. We do not see how an overly broad and speculative

---

[12]Heineman-Guta claims that the Bennett Complaint fails the essential facts test because it lacks allegations that the scheme actually caused physicians to implant BSC devices or that those devices were covered by Medicare. As explained above, the Bennett Complaint need not contain a detailed play-by-play narration of how the scheme led to the submission of false claims under Medicare. The Bennett Complaint alleges inter alia that through multiple forms of kickbacks designed to induce physicians and hospitals to use BSC devices, BSC caused false statements and claims to be made to the government for reimbursement under Medicare. We find those allegations sufficient.

-22-

complaint lacking essential facts would be sufficient in the first instance to notify the government of a fraudulent scheme under the FCA. A first-filed complaint that failed to do so would not preclude a later-filed complaint that does allege the essential facts of the alleged fraud. The purpose of the first-filed complaint under § 3730(b)(5) is to provide notice of potential fraud to the government so it may initiate its investigation into the alleged fraudulent scheme, nothing more. So "[o]nce the government is put on notice of its potential fraud claim, the purpose behind allowing qui tam litigation is satisfied." Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 (10th Cir. 2004).[13]

## CONCLUSION

For the aforementioned reasons, the district court's dismissal of Heineman-Guta's amended complaint due to the first-to-file rule under § 3730(b)(5) is affirmed. The parties shall bear their own costs.

-----

[13]Heineman-Guta's reliance on Campbell v. Redding Med. Ctr., 421 F.3d 817 (9th Cir. 2005), is misplaced. Campbell's holding was limited to situations where a complaint fails to satisfy the public disclosure rule under § 3730(e)(4)(A). Id. at 825. Since Heineman-Guta does not contend on appeal that the Bennett Complaint would be barred by the public disclosure rule, Campbell does not support her contention that construing § 3730(b)(5) to bar later-filed complaints would permit opportunistic plaintiffs with no inside information to displace actual insiders with knowledge of fraud.